# Boulden v. The State.

*Indictment for Murder.*

1. *Dying declarations; admissible though death does not ensue immediately.*—Declarations which are uttered under a sense of impending dissolution are admissible in evidence as dying declarations, although death did not occur until after the lapse of considerable time; and with a view of proving dying declarations which were made nearly two months before the death of the deceased, it is competent to ask a witness "What did the deceased say as to whether or not he thought he would get well?" just before making such declarations.

2. *Secondary evidence of dying declarations; when inadmissible.*—When dying declarations are reduced to writing at the time they are made, every reasonable effort which might have resulted in the production of the written statements must be shown to have been made without avail, before secondary evidence of such declarations can be received; and the testimony of a witness who had the custody of the writing containing the dying declarations, that he turned it over to the grand jury and had not seen it since, that he had failed to find it

[Boulden v. The State.]

among his own papers after diligent search, and that after diligent search, together with the solicitor and clerk of the court, through the grand jury papers had failed to find it, is an insufficient predicate to authorize the admission of oral evidence of the dying declarations.

3. *Refreshing memory of witness before going on stand; when admissible to be shown.*—It is admissible to ask a witness, on cross-examination, if he has talked with others in reference to the facts of the case, as a means of testing the reliability of his recollection ; and a witness testifying to dying declarations may be asked, on cross-examination, if deceased's.wife did not repeat to him the deceased's dying declarations about which he testified just before he went on the stand to be examined,

4. *Evidence of who swore out warrant for defendant's arrest, inadmissible.*—On a trial under an indictment for murder, evidence as to who swore out the warrant for defendant's arrest is immaterial and inadmissible.

.5. *Evidence; what admissible on trial for murder.*—On a trial for murder, when it is the State's theory, having support in some of the tendencies of the evidence, that defendant went to the place of the homicide with the intention to resist with violence, if necessary, a claim of deceased to certain lumber, it is competent and admissible for defendant to testify in his own behalf, that, at the time of the difficulty, he did not know of the claim of any one to the lumber.

6. *Charge as to reasonable doubt.*—In a criminal prosecution, a charge that instructs the jury, that "If from all the evidence the jury believe it is possible, or that it may be, or perhaps the defendant is not guilty, this degree of uncertainty does not amount to reasonable doubt, and does not entitle the defendant to an acquittal," but that they must convict if they should, from all the evidence, believe beyond a reasonable doubt that defendant is guilty, "although they may also believe that it is possible that he is not guilty," is correct and properly given.

7. *Same.*—A charge to the jury, which instructs them that "A doubt to justify an acquittal must be reasonable, and it must arise from a candid and impartial investigation of all the evidence in the case ; and unless it is such that were the same kind of doubts interposed in the graver transactions of life it would cause a reasonable and prudent man to hesitate and pause, it is insufficient to authorize a verdict of not guilty," asserts a correct proposition, and the giving of it is not error.

8. *Self-defense; provoking the difficulty.*—If the defendant provoked or brought on the difficulty which resulted in the homicide, or entered willfully in the fight with the deceased, he can not set up self-defense on a trial for murder ; and a charge instructing the jury to this effect is correct.

9. *Same; burden of proof.*—To sustain a plea of self-defense, the burden is on the.defendant to prove that he had no reasonable and safe avenue of escape from the danger which threatened him,

10. *Malice; definition in its legal sense* —Malice, in its legal sense, means a wrongful act, done intentionally, without just cause or excuse ; and a charge to the jury that instructs them "that malice, in its common acceptation means ill will against a person; but in its legal sense means a wrongful act, done intentionally, without just cause or excuse," is properly given.

11. *Murder in the first degree; charge to the jury.*—In order to constitute murder in the first degree, the homicide must be purposely committed, after reflection, with malice, and must be determined on beforehand ; and on a trial for murder it is a proper charge that instructs the jury, that if they believe beyond a reasonable doubt that the defendant "purposely killed the deceased, after reflection, with a wickedness or depravity of heart towards said deceased, and the killing was determined on beforehand, even a moment before the fatal blow was made, the defendant is guilty of murder in the first degree."

12. *Charge as to knife being deadly weapon.*—Where, on a trial for murder, it is shown that the fatal blow was caused by stabbing the deceased with a knife, and there is evidence of the nature of the wounds inflicted with the said knife, from which its character can be inferred, an instruction to the jury "that a knife, without further description or evidence showing the size or the character of the knife, does not raise the presumption that it was a deadly weapon," is abstract and properly refused.

13. *Misleading charges* are always properly refused.

APPEAL from the City Court of Decatur.

Tried before the Hon. W. H. Simpson.

The appellant in this case was indicted and tried for the murder of John A. Herndon, and was convicted of murder in the second degree, and sentenced to the penitentiary for twenty years.

Upon the trial of the case, as is shown by the bill of exceptions, the evidence for the State tended to show, that prior to January 6, 1893, the deceased had leased a farm in Morgan county ; that on the morning of January 6th, 1893, he, in company with his brother, Jim Herndon, and three other persons, went in a wagon to a place on said farm, where the defendant was knocking plank off of a fence; that previous to that date, the deceased and his brother had ordered the defendant to leave the farm, and had forbidden his taking the plank from the fence; that on arriving at the place where the defendant was knocking off the said plank, the deceased and his brother got out of the wagon, his brother having an ax in his hand, which he laid down by the side of a pile of

lumber; that upon the two going within a few feet of the defendant, the brother of the deceased, Jim Herndon, said to the defendant: "Todd, what are you going to do with this plank?" to which the defendant replied, "I am going to move it." Jim Herndon said: "Don't you move this plank; it is ours." Whereupon the defendant replied: "Dont' you move it either," and immediately struck at Jim Herndon with an ax, and cut him on the chin; that when the defendant went to strike Jim Herndon the second blow, the deceased said to him: "Don't do that," and grabbed the defendant from behind; that the defendant dropped his ax and then turned on deceased and began cutting him; that Jim Herndon then ran up to where the deceased and the defendant were scuffling, and grabbing the defendant in the back by his collar, pulled him loose, whereupon the defendant turned on Jim Herndon and commenced to cut him; that the deceased then drew his pistol and shot at the defendant twice. One Dymus Todd then ran up and took the pistol from the deceased, stepped back and shot at him twice; that said Dymus Todd then held first the deceased, and then Jim Herndon, in order that the defendant might cut them; that the said Jim Herndon, getting away, walked off a short distance, and that as the deceased tried to follow him, he walked under a barbed wire fence, which caught him by the collar of the coat, and while so held the defendant ran up to him and stabbed him in the back, the knife penetrating his lungs, and that it was from this blow that death ensued.

The testimony for the defendant was in conflict with that of the State as to who was in fault in bringing on the difficulty; and tended to show that upon the deceased and his brother coming up to where the defendant was knocking plank off the fence, and the defendant saying that he was going to move the plank, the said Jim Herndon struck at him, with his ax; that the defendant warded off the blow with his own ax, which struck Jim Herndon; that thereupon the deceased made for the defendant, drawing his pistol, and shot at him; that when the deceased shot him the defendant walked off, and, the deceased following him, struck him, and that as the deceased turned after having struck the defendant, the defendant cut him in the back.

The rulings of the court as to the introduction of the

dying declarations; as testified to by the witness Banks, are sufficiently shown in the opinion.

On the cross-examination of the witness Banks, he was asked, if he had met the wife of the deceased in the court-house building, and after answering that he had, the defendant then asked him the following questions : "If she had undertaken to repeat to him what her husband said in his dying declaration, which was written by the witness?" The State objected to this question, the court sustained the objection, and the defendant duly excepted.

On the cross-examination of one Rich, a witness for the State, and after he had testified that he arrested the defendant and Dymus Todd, the defendant asked said witness : "Who swore out the warrant for the defendant and Dymus Todd?" The court sustained the State's objection to this question, and the defendant duly excepted.

During the examination of the defendant as a witness in his own behalf, and after having given his version of the ·difficulty,· he was then asked : "If, at the time of the difficulty, he knew of any claim of any person to the lumber when he went to work that morning?" The State objected to this question, the court sustained the objection, and the defendant duly excepted.

The court, at the request of the solicitor for the State, gave the following written charges to the jury :    (1.) "To prove beyond a reasonable doubt that the defendant is not guilty, does not mean that the State must make the proof by an eye witness, or to a positive, absolute, methematical certainty. This latter measure of proof is not required in any case. If from all the evidence the jury believe it is possible, or that it may be, or perhaps the defendant is not guilty, this degree of uncertainty does not amount to a reasonable doubt, and does not entitle the defendant to an acquittal. All that is required is that the jury should from all the evidence believe beyond a reasonable doubt, that the defendant is guilty, and if you so believe, and you further believe, beyond all reasonable doubt, from the evidence, that the killing occurred in this county, before the finding of this indictment, you must find the defendant guilty, although you may also believe from the evidence, that it may be that he is not guilty, or that it is possible that he is not

guilty." (2.) "Gentlemen of the jury, I instruct you as
a matter of law, that in considering the case, you are not
to go beyond the evidence to hunt up doubts, nor must
you entertain such doubts as are merely imaginary, or
conjectural. A doubt to justify an acquittal, must be
reasonable, and it must arise from a candid and impar-
tial investigation of all the evidence in the case; and un-
less it is such that were the same kind of doubts inter-
posed in the graver transactions of life, it would cause
a reasonable and prudent man to hesitate and pause,
it is insufficient to authorize a verdict of not guilty  If
after considering all the evidence, you can say that you
have a fixed conviction of the truth of the charge, you are
satisfied beyond a reasonable doubt." (3.) "If the defend-
ant provoked, or brought on the difficulty, or entered will-
ingly into the fight with deceased, then he can not set
up self-defense in this case." (4.) "To sustain the plea
of self-defense set up in this case, the burden is on the
defendant to prove to your satisfaction that he had no
reasonable and safe avenue of escape from the danger,
which threatened him, and not on the State to prove it."
(5.) "I charge you, gentlemen of the jury, that malice,
in its common acceptation, means ill-will against a per-
son, but in its legal sense, means a wrongful act, done in-
tentionally, without just cause or excuse." (6.) "If you
believe beyond a reasonable doubt, from all the evidence
in this case, that defendant in this county, before the
finding of this indictment, purposely killed the deceased,
by stabbing or cutting him with a knife, after reflection,
with a wickedness or depravity of heart towards said
deceased, and the killing was determined on before hand,
even a moment before the fatal blow was made, the de-
fendant is guilty of murder in the first degree." The
defendant separately excepted to the giving of each of
these charges, and also separately excepted to the court's
refusal to give to the jury, among others, the following
written charges requested by him : (7.) "If from all
the evidence, the jury can not tell with reasonable cer-
tainty where the fault of the killing lies, it is their duty
to acquit defendant; for this fact alone, if it be a fact,
is what the law terms a reasonable doubt, and if the
jury has a reasonable doubt as to the defendant's guilt,
then they should acquit the defendant." (20.) "I
charge you, gentlemen of the jury, that a knife without

[Boulden v. The State.]

further description, or evidence showing the size, or the character of the knife, does not raise the presumption that it was a deadly weapon." (22.) "I charge you, gentlemen of the jury, that although you may discredit the account given by the defendant, as to the means by which the deceased came to his death, and although you may be satisfied that his statements in this respect are unreasonable, this would not deprive the defendant of the benefit of the evidence in the case, whether introduced by the State for the purpose of criminating him, or by himself as exculpatory evidence. It is upon the whole evidence the jury must make up their verdict."

S. T. WERT and PRICE & WADE, for appellant.

WM. L. MARTIN, Attorney-General and W. W. CALLA-HAN, for the State.

HEAD, J.—With the view of proving the dying declarations of deceased, the State asked its witness, Banks, "What did the deceased say about whether or not he thought he would get well?" The defendant objected, on the ground that the evidence showed that deceased did not die for nearly two months after the wound was received, and that it was too far from the time of his death to be received as a dying declaration. The objection was properly overruled.—*Reynolds v. State*, 68 Ala. 502 ; 1 Green. Ev., § 158. It is true there was no evidence, so far as the bill of exceptions shows, (and it purports to set out all the evidence) , showing what relation the statement made by the deceased, in reference to getting well, bore to his declarations touching the facts of the homicide. Without such proof the declarations were inadmissible ; but no question was raised by the defendant on this point.

The dying declarations were reduced to writing at the time they were made. The court permitted oral evidence of them to go to the jury without the production of the writing, to which the defendant excepted. Witness Banks, who testified to the declarations, and that they had been reduced to writing, was asked by the court where said dying declaration was? He replied, that he had turned it over to the grand jury of the city court at

[Boulden v. The State.]

the June Term, 1893, and had never seen it since; that
he had made diligent search among all of his own papers
and had failed to find it, and that he, together with the
solicitor and clerk, made diligent search through the
grand jury papers and failed to find it. Upon this predi-
cate, the court admitted the secondary evidence. We
think the predicate was insufficient. It is of the highest
importance, particularly in a cause involving such con-
sequences as this, when important evidence exists in
writing, that the writing itself be produced; and its pro-
duction should be required, if, by any means, it is practi-
cable. Every reasonable effort which it appears might
have resulted in its production should be shown to have
been made, without avail, before secondary evidence
should be received. The reason of the rule is too ob-
vious to require elaboration. The production of the writ-
ing, in the present case, rather than proof of the dying
declarations by the possibly uncertain and inaccurate
memories of witnesses, may have been of the last impor-
tance to the prisoner. The witness makes the indefinite
statement that he turned the paper over to the grand
jury. Just how he did so, is not stated. The grand jury
was composed of at least 15 men. It does not appear
what member of that body received the paper, and, of
course, he was not called to testify what he did with it,
and no reason was shown why he was not. The next,
and only other evidence, is the statement of the witness
that he, with the solicitor and clerk, made diligent search
''through the grand jury papers,'' and failed to find the
paper. Where these papers were when examined, how
they got there, in whose custody, how long they had been
there, and how the witness knew they were grand jury
papers, do not appear. There is not an intimation that
the search was made in the place where the papers which
went into the custody of the grand jury, at the June
Term, 1893, were usually kept and ought to have
been found, even if that evidence had been suffi-
cient. Indeed, it does not appear that the witness
knew, or could know, except from hearsay, where those
papers were usually kept; or that he was capable of
identifying them as the papers of the grand jury of the
June Term, 1893. He was a magistrate, living in the
country, and had nothing to to do with the custody of
the grand jury papers, and no connection with the clerk's

office.    It is manifest he knew nothing about them. The clerk, who is presumed to have been in the court house, was not examined on the subject.    It would be idle to contend that such evidence as this shows the exercise of that degree of diligence sufficient to let in secondary evidence.

It is common, and we think allowable, practice to inquire of witnesses, on cross-examination, if they have talked with others in reference to the facts of the case ; not as a means of impeaching the character of the witness but of testing the accuracy or reliability of his recollection.    If a witness's memory has been refreshed before going on the stand, by having the facts rehearsed to him by others, we think the jury ought to know it, that they may consider it for what it appears to be worth, in determining how far the recollection of the witness is reliable.    Hence, if the wife of the deceased, who was in the court house, rehearsed to the witness Banks, before he went upon the stand, the alleged dying declarations of her husband, the defendant should have been permitted to prove the fact, on cross-examination of Banks, as he proposed to do.

It was immaterial who swore out the warrant for the arrest of defendant and Dymus Todd.

It was a theory of the State, having some support in the tendencies of the evidence, that the defendant and others went to the place of the difficulty that morning to resist, with violence, if necessary, a claim of deceased and others to the lumber that was there, in pursuance of which the difficulty and homicide occurred.    This being so, we think it was competent for the defendant to testify, in his own behalf, that, at the time of the difficulty, he did not know of any claim of any person to the lumber.

We see no objection to the first, second and third charges given for the State.

The fourth charge given for the State correctly places the burden of proof touching the duty of retreat, and was properly given.

The fifth charge correctly defines malice, in its legal sense, and was properly given.—Clark's Manual Cr. Law, p. 75, § 470 and cases cited ; Roscoe's Cr. Ev., (7th Ed.) p. 21, Broom's Legal Maxims, top p. 315.

The sixth charge substantially hypothesizes the char-

acteristics of murder in the first degree as defined by the statute.—Code, § 3725. It requires, in order to constitute that degree of murder, that the homicide be purposely committed, after reflection, with malice, and that it was determined on before hand. These are the equivalent of the wilfullness, deliberation, malice and premeditation which the statute requires.

Charges 1, 2, 3, 4, 5, 6, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, and 21, requested by the defendant, are so obviously erroneous or improper, upon principles so often declared by this court, that we deem it unncessary to consider them in detail. Some of them require an acquittal entirely, upon facts which would justify an acquittal of murder only. The indictment involved the charge of manslaughter as well as murder.

Charge 20 was abstract and properly refused. This is not a case, as the charge supposes, without proof of the character of the knife. The jury were informed of the nature of the wounds inflicted upon the deceased with the knife, and they could infer its character from this evidence.

Charge 22 is so drawn that it was, if given, liable to confuse and mislead the jury. It was properly refused.

Charge 7 is more calculated to confuse than to instruct, and was properly refused.

The questions reserved touching the organization of the jury will not likely arise on another trial, and we do not consider them. Reversed and remanded. Let the prisoner remain in custody until discharged by due course of law.