# Allen v. State.

*Indictment for Murder.*

1. *Murder; when statements of defendant about deceased admissible.*—
Where on a trial under an indictment for murder, it is shown that
just before the homicide the deceased cursed and used grossly in-
sulting epithets to the defendant to such an extent that he was car-
ried away from the defendant, statements made by defendants dur-
ing deceased's absence a few minutes before the fatal rencounter, on
being advised by friends to go home before deceased returned, that
" I will not run from him," and "I can't take everything," are ad-
missible in evidence as being relevant to the enquiry as to whether
the subsequent killing by defendant of deceased was in resentment
of the latter's abuse, and not in self-defense.'

2. *Same; irrelevant evidence; statement of opinion of third person as
to deceased's purpose inadmissible.*—In such a case, the statement by a
third person, as deceased started to return to the place where de-
fendant was, and where he had just a few minutes before grossly in-
sulted defendant, that "hell's going to be pay," is the mere expres-
sion of the opinion of such third person, and is not admissible in evi-
dence.

3. *Same; same.*—On a trial under an indictment for murder, when
it is shown that defendant killed deceased by cutting the carotid ar-
tery, evidence that a similar wound any where else on the body, or
upon any other portion of the neck, would not have been mortal, is
inadmissible and incompetent.

4. *Same; same.*—On a trial for murder, the fact that the person
slain was the uncle of the owners of a certain still, which the deceased
claimed had been destroyed by revenue officers, who were informed of
its locality by defendant, is irrelevant to any issue in the case, and
inadmissible in evidence.

5. *Charges to the jury; no error to refuse those which are mere repe-
titions of charges given.*—A court commits no error in refusing to give
charges requested, which are mere repetitions of charges already
given, or contain substantially the same propositions embodied in
the charges already given, even, though the principles announced in
such charges are abstractly correct.

6. *Same; undue prominence to bad character of deceased.*—In a trial
for murder,a charge which instructs the jury that if they are in doubt
as to who was the aggressor in the difficulty resulting in the homi-
cide, it is their duty "to consider the violent and dangerous charac-
ter of the deceased if you believe from the evidence the deceased had
such a character, in determining who was the aggressor," the defend-

[Allen v. State.]

ant or the deceased, is erroneous, and properly refused, in that it gives undue prominence to the evidence of deceased's bad character for peace and quiet.

7. *Same; erroneous by reason of reference to wrong person.*—On a trial under an indictment for murder, a charge which postulates its instruction upon the jury believing "that the *deceased* had threatened to do the *deceased* great bodily harm," or which instructs the jury that they "may look to the conduct of the *deceased* at the time of the killing, in connection with the other evidence, to determine whether the *defendant* was a violent and dangerous man," is patently erroneous and properly refused.

8. *Same; exacting too high a degree of proof.*—In a criminal case, a charge which instructs the jury that the evidence "must be so convincing as to lead the minds of the jury to the conclusion that the defendant can not be guiltless, before they can find him guilty," is affirmatively bad, in that it exacts too high a degree of proof.

9. *Same; reasonable doubt; erroneous definition.*—A charge in a criminal case which defines a reasonable doubt of defendant's guilt, requiring acquittal, to be "such a doubt as in the graver affairs and transactions of life would cause a reasonable and prudent man to pause and hesitate," is erroneous as announcing a faulty definition of a reasonable doubt, and is properly refused. (*Welsh v. State,* 96 Ala. 92, and *Bouldin v. State,* 102 Ala. 78, explained and modified.)

APPEAL from the Circuit Court of Clay.

Tried before the Hon. GEORGE E. BREWER.

The appellant was indicted, tried and convicted of murder in the second degree, for killing one William Lankford, and sentenced to the penitentiary for ten years.

It was shown by the evidence that defendant killed Lankford in Clay county on the 21st day of February, 1894, at Motley's store, by cutting him with a knife, and that the wound inflicted upon deceased was a stab in the right side of the neck about an inch deep, which penetrated the carotid artery, thus causing death. Briefly stated, the testimony on the part of the State tended to establish the guilt of the defendant, or that the defendant cut said Lankford under provocation of gross insults and without any overt act on Lankford's part; while the testimony on the part of the defendant tended to show a case of self-defense. The uncontradicted evidence showed that Lankford, Kilgore, Sides and others were at Motley's store when defendant came in, about three o'clock in the afternoon. It further shows that immediately upon the entrance of defendant,

Lankford, without cause, cursed and abused him and applied to him foul epithets, accusing him of having given away or reported an illicit distillery to the revenue officers, to such an extent that his friend, Monkers, carried him out of the store and down to Truett's store, about forty yards away, for the evident purpose of preventing him from assaulting the defendant. During such time defendant did or said nothing to Lankford that was in the least insulting. It was further shown that deceased, immediately after this, exchanged knives with one Tidwell while at Truett's store, getting a much larger knife; that within fifteen or twenty minutes after he was carried out of Motley's store, said Lankford returned, the defendant having meanwhile taken a seat on the counter on the north side of the store and near Kilgore, who was sitting immediately on his left. The testimony on the part of the State tended to show that when Lankford returned to Motley's store, he entered the front door and walked down in front of the defendant, and within a few feet of him began cursing him anew. He then lit his pipe and took a seat on the counter by Kilgore and immediately on his left, defendant, Kilgore and Lankford being seated on same counter, Kilgore being between, and Lankford being on Kilgore's left. The State's testimony also tended to show that when Lankford entered the store he did not have his knife in his hand and did not have it in his hand when he took his seat on the counter; that immediately after he sat down on the counter he again cursed defendant and applied to him a foul epithet, and defendant said to him he would not take, or could not take, that any more, whereupon said Lankford again used the same language to defendant and defendant jumped off the counter, took three steps towards Lankford, caught him by the forehead with his right hand and stabbed him on the right side of his neck with his left hand, striking him but one blow, and then turned and ran or walked rapidly to the side door; Lankford following him to the door. Several of the witnesses testified that they saw Lankford's knife open in his right hand as he followed the defendant to the door; and one State's witness testified that he drew his knife after he was cut.

The testimony for the defendant tended to show that

as Lankford left Truett's store, which is about forty yards from Motley's, that he had his knife in his hand and said to Wyley Stone with an oath, that he was not going to be run over, and as he entered the door or got on the veranda of such store, he had his knife open in his right hand. Defendant testified that as Lankford entered the door he had his knife open in his hand and walked down in front of where he, defendant, was sitting, and within a few feet of him and cursed him, applying a most opprobrious epithet; that Lankford then took his seat on the counter and again cursed him, using the same epithet; that he, the defendant, said to him: "Mr. Lankford, that is the third time you have called me that, and I do not want you to do it any more;" that Lankford repeated it and said, "If you do not like it, you can help yourself," and during such time had his knife open in his right hand; and as he began to repeat it, or just before, defendant took his knife out of his pocket; that as Lankford repeated such language, he (Lankford) began to get off of the counter, and was partially off of the counter, with his face turned in the direction of the defendant, with his knife open in his right hand and drawn back in a striking attitude; and while in this position, having got his left foot on the floor, before defendant got off of the counter, and while in the act of getting off the counter, defendant sprang off of the counter and as he struck the floor, he and Lankford being in about two feet of each other and in striking distance, he struck him one blow with his knife with his left hand and then ran to the side door, Lankford pursuing him with his knife open and saying, with an oath, "you had better get." The testimony further showed that Lankford pursued the defendant to the side door when Walker stopped him, and he then walked towards the front of the store dropping his knife in the doorway and died in five or ten minutes. The testimony further tended to show that the defendant was a man of good character and the deceased was a violent, dangerous and turbulent man, and especially so when drinking, and that he was drinking on the day he was killed; that at the time of the killing it was generally rumored in the community that defendant had reported the Evans boys for distilling, and that the revenue officers had broken up their still; and that about two weeks before

the killing the deceased had told one Fargarson that defendant had reported the Evans boys to the revenue officers; and that somebody ought to kill him, and that he would kill him.

On the examination of S. L. Walker as a witness for the State, he testified that he was clerking in Motley's store at the time of the killing of Lankford by the defendant, and was present during the quarrel. After he had testified to the circumstance of the killing, the solicitor then asked the witness: "If he said anything to, the defendant after Lankford had been taken out, and while Lankford was absent, and what the defendant said in reply?" The defendant objected to this question, on the ground that it called for immaterial and irrelevant evidence. The court overruled this objection, and the defendant duly excepted. In answer to the question the witness stated that, after Lankford had gone out of the store, he went to the defendant and said to him: "If I was him I would go home; and Allen said to me, that he would not run from him." The defendant moved to exclude this answer of the witness, from the jury, on the ground that it was irrelevant and immaterial evidence, and duly excepted to the court's overruling his motion.

On the examination of one George Sides, as a witness for the State, and after he had testified to the circumstances of the killing, the solicitor asked him the following question: "What, if anything, he said to the defendant, and what the defendant said in reply, after Monkers asked Lankford out?" The defendant objected to this question, on the ground that it called for incompetent, immaterial and irrelevant evidence. The court overruled the objection, and the defendant duly excepted. The witness answered, that a few minutes before the difficulty, he told the defendant he had better get away from there, and had better go home; and the defendant replied: "I can't take everything." The defendant moved to exclude this answer from the evidence, on the ground that it was incompetent, irrelevant and immaterial testimony, and duly excepted to the court's overruling his motion.

Upon the examination of Wyley Stone as a witness, he testified that he was at Truett's store when Lankford came there from Motley's store. The defendant asked

the witness : "If, about the time Lankford started back
to Motley's store, ten minutes before the difficulty, Ben
Tidwell did not say in Lankford's presence at Truett's
store : 'Look out men, hell's going to be to pay?' " Upon
the objection of the State to this question, because it
called for immaterial and irrelevant evidence, the court
sustained the objection, and the defendant duly excepted.

On the cross-examination of a witness introduced by
the State in rebuttal, who on his direct examination had
testified that Lankford's general character for peace and
quiet was good, the witness testified that he had fre-
quently seen Lankford when drunk, and when drunk he
was a fussy, quarrelsome man. The defendant's coun-
sel then asked said witness the following question :
"If he was not related to the Evans boys, whose still
was said to have been reported to the revenue officers a
short time or a few weeks before the difficulty between
the said Lankford and the defendant, in which Lankford
was killed?" The solicitor objected to the question, on
the ground that it called for immaterial and irrelevant
testimony. The court sustained the objection, and to
this ruling the defendant duly excepted.

Upon the introduction of all the evidence, the defen-
dant requested the court to give to the jury 67 written
charges. The court gave 34 of these charges, but re-
fused 33. The defendant separately excepted to the
court's refusal to give each of the 33 as asked. Among
these charges were the following, which are the only
ones necessary to be copied in this statement : (12.) "If
the jury are in doubt as to who made the first overt act of
attack, or as to who was the aggressor, it is the duty of the
jury to consider the violent and dangerous character of
the deceased, if you believe from the evidence that the
deceased had such a character, in determining who was
the aggressor, or made the first overt act or attempt to
make an assault, the deceased or the defendant." (13.) "If
you believe from the evidence that deceased had threatened
to do the deceased great bodily harm, you should weigh
and consider such testimony in connection with the other
testimony in the case, in determining who was the ag-
gressor in the difficulty, and in considering whether or not
it reasonably appeared to the defendant that he was in
present or impending danger of grievous bodily harm."
(45.) "The court charges the jury, that the evidence

[Allen v. State.]

in this case must be so convincing as to lead the minds of the jury to the conclusion that the defendant can not be guiltless, before they can find him guilty.'' (54.) ''If you believe from the evidence that Allen, at the time he struck Lankford, was free from bringing on the difficulty, and that he was assaulted by Lankford with a knife in such a manner as to produce in the mind of a reasonable man that it was necessary to strike to prevent a taking of life or great bodily harm to defendant, and that defendant reasonably believed that such necessity existed, then, you must find the defendant not guilty, unless you believe from the evidence, beyond a reasonable doubt, that Allen could have escaped or retreated at the time of said assault, without increasing his danger to life or great bodily harm from the assault of Lankford.'' (58.) "The jury may look to the conduct of the deceased on the day and at the time of the killing, in connection with the other evidence, to determine whether the defendant was a violent and dangerous man.''

WHITSON & GRAHAM, LACKEY & MANNING and PEARCE & STEED, for appellant.—Charges 3 and 62, defining what constitutes a reasonable doubt, should have been given.— *Welsh v. State*, 96 Ala. 92 ; *Boulden v. State*, 102 Ala. 78. 2. The burden of proof is on the State to show that the defendant was not free from fault in provoking or encouraging the difficulty.—*McCormack v. State*, 102 Ala. 163 ; *Cleveland v. State*, 86 Ala. 1 ; *Naugher v. State*, 105 Ala. 26. When there is evidence tending to establish the plea of self-defense, and there is no evidence tending to show that defendant was not free from fault in provoking or encouraging the difficulty, or it is affirmatively shown that he was so free from fault, the plea of self-defense, if otherwise made good, will prevail, and a charge setting out the essential elements of self-defense, leaving out the question of freedom from fault, is proper and should be given.—*McCormack v. State*, 102 Ala. 163 ; *Naugher v. State*, 105 Ala. 26.

WILLIAM C. FITTS, Attorney-General, for the State.— The defendant asked a number of instructions which were mere repetitions in substance of charges which had been given by the court; and such instructions were

properly refused.—*Smith v. State*, 92 Ala. 30; *L. & N. R. R. Co. v. Hurt*, 101 Ala. 34; *Murphy v. State*, 108 Ala. 10.

The other charges asked by the defendant were so inaccurately prepared as to make neither good English nor good sense, and were, therefore, properly refused.—*Peterson v. State*, 74 Ala. 34.

McCLELLAN, J.—The testimony of Walker and Sides as to what was said to and by the defendant while Lankford was away from Motley's store was properly admitted. The defendant's declarations made at that time and in response to advice by these witnesses that he go home in order to avoid a difficulty, viz.: "I will not run from him," and "I can't take everything," had an obviously pertinent bearing on the inquiry whether the defendant stabbed Lankford in resentment of the latter's abuse of him or in self-defense.

The opinion expressed by Ben Tidwell in Lankford's presence at Truett's store, as the latter started back to Motley's store, that "hell's going to be to pay," was properly excluded. Lankford's purpose in returning to Motley's store could not be shown by evidence of Tidwell's deductions in the premises expressed in this ambiguous manner.

The defendant killed Lankford by cutting the carotid artery with a knife. But one blow was delivered or attempted. Defendant proposed to prove by Dr. Motley, who examined the fatal wound, that "a similar wound or one of the same depth and width anywhere else on the body, particularly immediately in front, or near the wound inflicted, that did not touch the carotid artery," would not have been mortal. We suppose the purpose of this testimony was to justify or excuse or palliate the act of the defendant by showing that his stroke might well have been less accurate and consequently not fatal. On the same principle, if he had shot Lankford through the head, it would be competent to show that he is not responsible for his ensuing death because if his aim had been less deadly he might have pierced his ear, only and death would not have ensued. The idea is so absurd that we will not pursue it further.

The fact that Lankford was the uncle of the "Evans boys," whose distillery had been destroyed by revenue

. [Allen v. State.]

officers, informed of its location, as Lankford insisted, by the defendant, was too remote from any issue in the case to be admissible.

Sixty-seven charges were requested by the defendant. Of these thirty-four were given and thirty-three refused. Excepting refused charges numbered 3, 12, 13, 45, 54, 55, 58 and 62, every proposition involved in the charges refused is embodied in substantially the same form in the charges which were given at the request of the defendant. The court was under no duty to repeat these instructions and committed no error in refusing to do so, whether these charges were abstractly sound or not. *Smith v. State*, 92 Ala. 30; *Louisville & Nashville R. R. Co. v. Hurt*, 101 Ala. 34; *Murphy v. State*, 108 Ala. 10.

Charge 12 was properly refused. It gives undue prominence to the evidence of deceased's bad character for peace and quiet; and literally interpreted means that if the jury are in doubt as to who was the aggressor in the difficulty from all the evidence, including, of course, that as to Lankford's character, they should then again consider that evidence of character in removing the doubt, and determining that he, and not the defendant, brought on the difficulty.

The opening postulate in charge 13, that if the jury believe from the evidence that the *deceased* had threatened to do the *deceased* great bodily harm, &c. &c., is sufficient to condemn it. Of a similar character with like vitiating result is the declaration in charge 58, that the jury might look to the conduct of the *deceased*, &c., &c.; to determine whether the *defendant* was a violent and dangerous man.

Charge 45, to the effect that the jury must believe that the defendant *cannot* be guiltless before they can find him guilty, is affirmatively bad, as has been expressly held by this court, in that it requires too high a degree of proof.

Charge 54 is abstract. There was no evidence of an assault by Lankford with a knife upon the defendant.

Charge 55 assumes that it reasonably appeared to defendant that Lankford had a knife open in his hand at the time therein stated. This was a question for the jury.

We are not to be understood as holding that the charges just above considered had no other infirmities

than those we have pointed out, but those referred to are sufficient to justify the court's refusal of them.

This leaves for our consideration only charges 3 and 62, which are, respectively, as follows: 3. "If from the evidence you have a doubt of the defendant's guilt, and such a doubt as in the graver affairs and transactions of life would cause a reasonable and prudent man to pause and hesitate, then such a doubt arising from the evidence is a reasonable doubt, and you should acquit the defendant." 62. "If on fairly considering the testimony your minds have such a doubt of defendant's guilt as that in the graver affairs of life would cause a prudent and reasonable man to pause and hesitate, then the defendant is not guilty beyond a reasonable."

The omission of the word "doubt" after the last word, "reasonable," in the charge last quoted, is itself sufficient to justify the court's refusal to give it. But, in our opinion, both these instructions are faulty definitions of a reasonable doubt, and were properly refused. A doubt which would cause a reasonable and prudent man to hesitate before accepting a given proposition as true is not necessarily a reasonable doubt. A man of whatever prudence and reason might pause and hesitate and consider because of a doubt as to the propriety or expediency of proposed conduct, though such doubt would not be one for the existence of which a good reason could be given; and the hesitation to act might well be only for the purpose of considering whether the doubt was substantial and reasonable or chimerical and shadowy, and, the consideration resulting in a conclusion that the intruding doubt was without foundation, he might then proceed to act without any reasonable doubt of the wisdom of his course. Jurors are assumed to be careful and prudent men. In considering a case submitted to them many doubts of guilt may arise which will cause them to pause and hesitate before reaching a verdict. But, if after stopping and thinking over the matter, they conclude that the doubt is unsubstantial and unsupported by any sufficient reason, they can not be said to have entertained a reasonable doubt of guilt. If this were otherwise, jurors would be required to acquit whenever a doubt of guilt arose which would cause them to pause and hesitate for the purpose of considering whether it were a reasonable doubt or not, and convictions would

become well nigh impossible. This seems to us to be quite clear; and the only apparent difficulty in the way of our conclusion that these charges were bad arises from two decisions of this court upon charges given which employ substantially the same language, but along with other statements, as is used in the instructions under consideration. The difficulty, however, is, as we shall undertake to show, more seeming than real. The cases referred to are *Welsh v. State*, 96 Ala. 92, and *Boulden v. State*, 102 Ala. 78. In the former case the trial court, *ex mero motu*, charged the jury as follows: "The term 'reasonable doubt' means a doubt which has some good reason for it arising out of the evidence in the case—such a doubt as you are able to find in the evidence a reason for. It means such a doubt as would cause a prudent man to pause and hesitate before accepting as true and acting upon any matters alleged or charged in the graver or more important affairs of life. As applied to evidence in criminal cases, it means an actual and substantial doubt, growing out of the unsatisfactory nature of evidence in the case. It does not mean a doubt which arises from some mere whim or vagary, or from any groundless surmise or guess; and, while the law requires you to be satisfied from the evidence of the defendant's guilt beyond a reasonable doubt, it, at the same time, prohibits you from going outside of the evidence to hunt up doubts upon which to acquit defendant. In arriving at your verdict, it is your duty to carefully and candidly consider the entire evdence in the case, and in so doing you should entertain such doubts only as arise from the evidence and are 'reasonable,' as already defined; and unless the doubt is a reasonable one, and does so arise, it will not be sufficient in law to authorize a verdict of not guilty. Then, gentlemen, if upon a careful and candid review of all the evidence, you ask your inward conscience, 'Is he the guilty one?' and the answer is, 'I doubt if he is,' you should acquit; but if the answer is, 'I have no doubt of it,' you should convict. So then, gentlemen, by a 'reasonable doubt' is not meant absolute certainty. There is no such thing as absolute certainty in human affairs; for justice is, after all, but an approximate science, and its ends are not to be defeated by a failure of strict and mathematical proofs." The defendant excepted to this part

of the oral charge, and we held that it was in accordance with many decisions of this court. In *Boulden v. State*, 102 Ala. 78, the court, *at the request of the solicitor*, gave the following charge : ''Gentlemen of the jury, I instruct you as a matter of law, that in considering the case, you are not to go beyond the evidence to hunt up doubts, nor must you entertain such doubts as are merely imaginary, or conjectural. A doubt to justify an acquittal, must be reasonable, and it must arise from a candid and impartial investigation of all the evidence in the case ; and unless it is such that were the same kind of doubts interposed in the graver transactions of life, it would cause a reasonable and prudent man to hesitate and pause, it is insufficient to authorize a verdict of not guilty. If after considering all the evidence, you can say that you have a fixed conviction of the truth of the charge, you are satisfied beyond a reasonable doubt.'' And the court said it saw no objection to the charge. Two considerations occur to us why the charges refused to defendant in this case do not stand upon the same footing with those parts of the charges in the cases referred to which, considered by themselves, are in effect that a doubt is reasonable which causes a prudent man to pause and hesitate. In the first place the charges given in both Welsh's and Boulden's cases contained a complete and sound definition of a reasonable doubt apart from this particular part of them, and these other parts of those instructions so bore upon the declaration that a doubt which would cause a prudent and reasonable man to hesitate and pause was a reasonable doubt, as to render that declaration more of an illustration of the effects of a reasonable doubt, as defined in other parts of the charge, upon the mind of a prudent man, than a definition of such doubt ; it was more in the way of telling the jury how a reasonable doubt would or should affect such a man, then by way of telling them that such a man so affected by doubt was being influenced by a reasonable doubt. In the second place, the defendants in those cases came to this court complaining of the giving of those charges by the trial courts. If the charges were faulty in the respect under consideration, the infirmity was favorable to the appellants, in that thereby the jury were authorized to acquit them on something less than a reasonable doubt of their guilt ;

and hence notwithstanding the infirmity the charges were not open to exceptions by them. In the present case, the declaration stands alone, and hence cannot be helped by other definitions of a reasonable doubt as it was in the cases cited; and the court was asked to make it by the defendant, so that it must be passed upon on its merits as an abstract proposition unaided by the fact that the party who excepted to the court's ruling is not in a position to do so. And standing thus alone on its inherent merits as a definition of a reasonable doubt, we are clear to the conclusion that it is faulty and was properly refused to the defendant. In so far as anything said in the cases of Welsh and Boulden may militate or be supposed to militate against what is here said, they must be modified.

We find no error in the record, and the judgment is affirmed.