544 So.2d 145 (1989)
William T. CREEL
v.
JoAnne C. DAVIS.
87-579.
Supreme Court of Alabama.
April 7, 1989.
*146 Charles W. Woodham, Abbeville, for appellant.
Douglas M. Bates, Dothan, for appellee.
PER CURIAM.
This appeal is from a judgment on a verdict awarding the plaintiff $75,000 on her claim based on interference with business or contractual relations. JoAnne C. Davis brought this action against Dr. William T. Creel, alleging that Creel wrongfully interfered with her employment as a respiratory therapist with Rehabilitative Health Services, Inc. Creel argues that the judgment should be reversed because he was not a stranger to the contract and because there was no evidence that he acted with malice.
This Court reviewed the law of intentional interference with contractual relations and the law of intentional interference with business relations in Gross v. Lowder Realty Better Homes & Gardens, 494 So.2d 590 (Ala.1986), and adopted a single rule to encompass both causes of action:
"We hold that this tort of intentional interference with business or contractual relations, to be actionable, requires:
"(1) The existence of a contract or business relation;
"(2) Defendant's knowledge of the contract or business relation;
"(3) Intentional interference by the defendant with the contract or business relation;
"(4) Absence of justification for the defendant's interference;3 and
"(5) Damage to the plaintiff as a result of defendant's interference.
"[n.] 3. We retain the principle that justification is an affirmative defense to be pleaded and proved by the defendant."
Id., at 597. See also Lowder Realty, Inc. v. Odom, 495 So.2d 23 (Ala.1986).
This Court has held that "a party to a contract cannot, as a matter of law, be liable for tortious interference with the contract," Lolley v. Howell, 504 So.2d 253, 255 (Ala.1987), and that "a principal's agent or employee, who acts for or on behalf of the principal, is a `party' to that principal's contractual and business relations and not a [stranger] thereto," Harrell v. Reynolds Metals Co., 495 So.2d 1381, 1388 (Ala.1986). Creel argues that he and Davis were ultimately employed by the same corporation and that, thus, he was not a stranger as to her employment contract and therefore cannot be liable for tortious interference with it unless it is shown that he acted outside the scope of his authority and with malice, citing Hickman *147 v. Winston County Hospital Board, 508 So.2d 237 (Ala.1987).
The following facts existed at the time of the actions made the basis of this suit. Creel was chief of staff at Henry County Hospital, in Abbeville, Alabama. Davis worked at Clay County Hospital in Fort Gaines, Georgia, which is just across the Georgia line from Henry County, Alabama. Rehabilitative Health Services, Inc. ("RHS"), Davis's employer, operated the cardiopulmonary department at Clay County Hospital under a contract to perform those services, and Davis worked as director of that department. Health Care Management Corporation ("HCMC"), a Georgia corporation, owned Clay County Hospital and operated Henry County Hospital under a lease from the Henry County Hospital Authority. Both RHS and HCMC were owned by Basic American Medical, Inc. ("BAMI"), an Illinois corporation.
RHS provided respiratory therapy services to both Henry County and Clay County Hospitals. William E. Daniel, an employee of HCMC, served as administrator of both hospitals. Davis's termination arose from conversations between Creel and Daniel that resulted in Daniel's telephoning Ralph Shokey, who was RHS's district manager and Davis's immediate supervisor. Shokey then told Davis she had a choice between termination and transfer to another location; she said she was unable to take a transfer, so she was terminated.[1] She testified that Shokey told her she was being terminated at Creel's request.
Creel argues that, because both RHS and HCMC were owned by BAMI, or because both hospitals were operated by HCMC, he and Davis were parties to a single contractual or business relation and, as a result, that she could not sue him for interference with that relation. Aside from the question of whether Dr. Creel, as chief of staff of Henry County Hospital, is an agent or employee of HCMC, cf. Stewart v. Bay Minette Infirmary, 501 So.2d 441 (Ala.1986), this argument overlooks the function of the separate corporate entities. Certainly, if BAMI were sued for the negligence of either Creel or Davis, it would deny any respondeat superior liability. Daniel testified that he did not have authority to fire Davis; although his conveyance to Shokey of Creel's concerns about Davis obviously carried great weight, it remains a fact that Davis's employment with RHS was not a contract to which Creel was a party.
Nor was HCMC a party to Davis's contract of employment with RHS, so Creel could not have been acting as a party to such a contract within the meaning of the rule quoted above from Harrell v. Reynolds Metals Co. Creel based much of his defense and much of his argument here on the possibility that Davis would have come to work at Henry County Hospital under reorganization and consolidation efforts being made at the time, and on his statements to Daniel that he would not be comfortable working professionally with Davis. This, at most, would have justified Creel in telling Daniel to tell Shokey not to send Davis to Henry County Hospital. Daniel testified that the decision on whether Davis came to work at Henry County Hospital would have been Shokey's. Because Creel's instructions to Daniel went beyond what was called for by any business relation to which he and Davis were parties, the trial court did not err in submitting the claim to the jury.
Creel argues the alleged absence of proof of malice[2] on two asserted issues. First, he says that agents or employees of a single employer can be liable to their fellow agents or employees for tortious *148 interference with the plaintiff's employment relation only if the defendant acted outside the scope of his authority and with malice, citing Hickman, Lolley, and Harrell, supra. Because of our holding that Creel was not a party to Davis's employment relation with RHS, this argument presents nothing to be addressed.
Second, Creel argues that the malice element of Hickman should be incorporated into the third element set out in Gross for cases brought against strangers to the business or contractual relation. Under such a redefinition of the tort, it would be "malicious interference" instead of "intentional interference." This argument amounts to an attempt to place the burden of proving lack of justification on the plaintiff. The Court in Gross made the decision to leave the burden of justification on the defendant, and we see no reason to change that decision.
Thus, Creel's arguments that he was not a stranger as to the contract and that a malice element should be incorporated into the tort present no reversible error. Outside of those arguments, Creel does not argue that there was insufficient evidence to submit the claim to the jury, and we do not see any basis for such an argument. Therefore, the judgment of the trial court is due to be, and it hereby is, affirmed.
AFFIRMED.
HORNSBY, C.J., and ALMON, SHORES and KENNEDY, JJ., concur.
MADDOX, J., concurs specially.
JONES, ADAMS, HOUSTON and STEAGALL, JJ., dissent.
MADDOX, Justice (concurring specially).
The only possible theory upon which a reversal of the judgment could rest would be that Dr. Creel was justified, as a matter of law, in doing what he did in this case. In order to determine whether Dr. Creel was justified, as a matter of law, in doing what he did, we must examine the underlying facts.
Dr. Creel was the chief of staff of the Henry County Hospital. Sometime during the fall of 1984 the hospital received a letter from an attorney for the grandmother of Ms. Davis concerning an incident that had occurred while the grandmother was a patient in the Henry County Hospital under the care of Dr. Creel. The administrator of the Henry County Hospital, William Daniel, had a conversation with Dr. Creel at approximately the same time that the letter was received. The administrator could not recall whether that conversation occurred before or after receipt of the letter. At that time, Ms. Davis was not on the staff of the Henry County Hospital, but was employed by RHS and was physically stationed at Clay County Hospital in Ft. Gaines, Georgia. The administrator was aware of the incident involving the grandmother of Ms. Davis after he came as administrator to the Henry County Hospital, even before he received the letter from the grand-mother's attorney. In any event, the administrator testified that he "understood there was a problem, and it had not been resolved."
Daniel described his first conversation with Dr. Creel as follows: "The conversation, as I understand it, was that Dr. Creel did not feel thatdid not feel comfortable, professionally, working with JoAnne, and that was the crux of what I got from the conversation." He testified that "[Dr. Creel] felt that something should be done about it, and he wanted something done about it; so [Dr. Creel] said ... `There should be someone that you can contact to do something about it.'"
At the time of this conversation, Dr. Creel admitted more patients to Henry County Hospital than any other doctor on the staff.
Daniel also testified that he talked with Dr. Creel about JoAnne "on more than one occasion." Daniel testified that he contacted his superiors about the matter, because "I would have to say that the conversations that we had was an indication that we needed to do something." Daniel stated it this way: "Dr. Creel stated that he had tried to cooperate with the hospitalthe *149 HCMCand he felt that we should be able to reciprocate and cooperate."
Daniel, even though he was also administrator of the Clay County Hospital, where Ms. Davis worked as an employee of RHS, did not have authority to fire Ms. Davis, but he contacted her employer. Ms. Davis was given an option of being transferred or being terminated. She refused to be transferred and was terminated.
The critical legal question presented by this factual setting is whether Dr. Creel proved, as a matter of law, that he was justified in doing what he did. In Gross v. Lowder Realty Better Homes and Gardens, 494 So.2d 590 (Ala.1986), this Court, in a footnote, set out the applicable principles of law that must be applied in answering this legal question:
"We retain the principle that justification is an affirmative defense to be pleaded and proved by the defendant. Whether the defendant is justified in his interference is generally a question to be resolved by the trier of fact. Polytec, Inc. v. Utah Foam Products, Inc., 439 So.2d 683 (Ala.1983). Whether a defendant's interference is justified depends upon a balancing of the importance of the objective of the interference against the importance of the interest interfered with, taking into account the surrounding circumstances. Restatement (Second) of Torts § 767 (1979), and Comments. The restatement utilizes the term `improper' to describe actionable conduct by a defendant. Non-justification is synonymous with `improper'. If a defendant's interference is unjustified under the circumstances of the case, it is improper. The converse is also true. Section 767 of the Restatement lists, and the Comments explain, several items that we consider to be among the important factors to consider in determining whether a defendant's interference is justified:
"(a) the nature of the actor's conduct,
"(b) the actor's motive,
"(c) the interests of the other with which the actor's conduct interferes,
"(d) the interests sought to be advanced by the actor,
"(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
"(f) the proximity or remoteness of the actor's conduct to the interference, and
"(g) the relations between the parties.
"Restatement (Second) of Torts § 767 (1979)."
494 So.2d at 597.
I now consider each of these factors in determining whether Dr. Creel proved, as a matter of law, that he was justified in doing what he did in this case.

The Nature of the Actor's Conduct
On cross-examination by counsel representing Dr. Creel, Daniel admitted that during one of his conversations with Dr. Creel the possibility came up of combining the respiratory therapy departments of the two hospitals. The following then occurred:
"Q. That is when Dr. Creel expressed some reservations about professionally working with Mrs. Davis, was it not?
"A. During that point in time, yes.
"Q. So his concern was at that time that JoAnne Davis and he not be put together in the same situation at the Henry County Hospital?
"A. (No response.)
"Q. Is that not true?
"A. He definitely had that concern.
"Q. So, when he said that you should do something about it on that occasion, he could just as easily have been saying: `Don't put us together in a situation where I can't work professionally with someone,' rather than your interpretation: `Get rid of JoAnne.'
"A. (No response.)
"Q. That came up in the same conversation that
"The Court (Interposing): Wait just a minute. Which question do you want him to answer?
"(No response.)
"Mr. Woodham: Go ahead.
"The Witness: The gist of the conversation was that he did not feel professionally *150 comfortable working with JoAnne.
"Q. He never told you to fire JoAnne, did he?
"A. Never said specifically, `I want you to fire JoAnne.'
"Q. That was your interpretation of what he meant, wasn't it?
"A. That was very much my understanding."

The Actor's Motive
While there was evidence that Dr. Creel's motive was to preserve the professional integrity of the hospital, he does not contend that Ms. Davis was professionally incompetent. On the other hand, there is evidence from which a factfinder could infer that his motive may have been based on factors other than her professional competence. In any event, a jury question was presented on this point.

The Interests Sought to be Advanced by the Actor
Again, there was evidence that, if believed, would show that Dr. Creel admitted many of the patients at Henry County Hospital. As chief of staff, he had a right to bring any concerns he might have about the professionalism of any employee of the hospital or of an employee who might furnish professional services pursuant to a contract. He had a right to advise the hospital about Ms. Davis. On the other hand, there was evidence that Dr. Creel wanted Ms. Davis fired for reasons not connected with her ability to perform her services in a professional manner at Henry County Hospital; consequently, a jury question was presented on this issue.
The Social Interests in Protecting the Freedom of Action of the Actor and the Contractual Interests of the Other
This calls for us to make a policy choice. The question is whether the societal interest in protecting the right of a chief of staff of a hospital to consult with the hospital administrator concerning the professional services furnished in that hospital outweighs the right of another professional, like Ms. Davis, to perform her services in that hospital. We are not without guidance. In Byars v. Baptist Medical Centers, Inc., 361 So.2d 350 (Ala.1978), a nurse who had successfully prosecuted a personal injury action against the hospital brought an action against the hospital to recover for its refusal to permit a nurses' registry to refer her as a nurse for patients in the hospital who desired a private duty nurse. This Court, in overturning a summary judgment in favor of the hospital, held:
"In this case, the plaintiff has alleged that the defendant's conduct against her was prompted by her recovery of a money judgment against it. The defendant maintains that its refusal to allow her to serve patients in its hospitals was due to her physical inability to serve patients.
"* * * *
"... If it is true that the defendant's conduct was based upon a negative assessment of the plaintiff's physical ability to perform her nursing duties, the defendant's conduct would not be actionable, for the hospital would have a legal right to establish, publish and apply reasonable standards of fitness, including physical fitness, for private duty nurses. If, on the other hand, the defendant's conduct was based upon the successful exercise by the plaintiff of her legal right to seek redress in the courts for injury due to the defendant's negligence, that conduct would not justify the interference with plaintiff's future employment opportunities with defendant's patients, but would violate her right as one qualified under the Nurses Registry to be referred to patients seeking her services. Under the pleadings and the evidence, whether or not the defendant's conduct was legal in itself and violated no right of the plaintiff was a genuine issue of material fact, therefore summary judgment was inappropriate."
361 So.2d at 355-56.
In Finley v. Beverly Enterprises, Inc., 499 So.2d 1366 (Ala.1986), a discharged nursing home employee who was informed that she could no longer work as a private duty *151 sitter for a nursing home patient brought an action against the nursing home for intentional interference with her business. This Court held that the nursing home was justified, as a matter of law, in establishing a policy that did not permit discharged employees to be employed as private duty sitters for patients in the nursing home. The facts in this case are obviously more like those in Byars, than like those in Finley.

The Proximity or Remoteness of the Actor's Conduct to the Interference
The evidence is overwhelming that Dr. Creel's conduct was directly related to Ms. Davis's firing. Dr. Creel cannot claim, therefore, that his conduct was too remote.

The Relations Between the Parties
While Dr. Creel contends that he and Ms. Davis worked for the same employer and that the principle of Hickman v. Winston County Hospital Board, 508 So.2d 237 (Ala.1987), should apply, we cannot agree. The status of the parties in this case is more akin to the status of the private duty nurse and the hospital in the Byars case. It is clear that Dr. Creel did not have the power as chief of staff to determine whether Ms. Davis worked in Henry County Hospital. In fact, the evidence shows that Dr. Creel said that if she were his employee, he would fire her.
Based on our application of the foregoing factors, we conclude that Dr. Creel did not prove that he was justified, as a matter of law, in interfering with plaintiff's contract.[3]
JONES, Justice (dissenting).
I believe the majority's treatment of the defense of justification is misguided under the facts of this case. The facts relating to the employer/employee relationship of the parties is somewhat complicated because of the "middle management" structure of the involved health care providers. On the one hand, Ms. Davis is an employee of Rehabilitative Health Services, which, in turn, contracts with several hospitals to provide certain therapy services. Ultimately, on the other hand, Ms. Davis, in her performance of such services, worked under the direct supervision of a physician (in this case, Dr. Creel). Under the law of agency, Dr. Creel could be held liable for Ms. Davis's culpable professional conduct. It seems to me that Dr. Creel is charged with interfering with his own professional relationship with Ms. Davisa relationship between him as the principal and her as his agent. Until this opinion, I was unaware that Alabama recognized such a cause of action.
HOUSTON, Justice (dissenting).
This case is not the classical case of tortious interference with an employment contract where an intermeddling third-party prevails upon another party to cause that party to fire, without cause, its employee. At all times that Dr. Creel allegedly interfered with Ms. Davis's contract with Rehabilitative Health Services, Dr. Creel was chief of staff of Henry County Hospital and he was discussing only with the administrator of that hospital the possibility of bringing in staff persons to that hospital. Dr. Creel was not an intermeddling third party; he was a party to the relationship and was acting within the line and scope of his employment or agency as chief of staff at Henry County Hospital. In Buckner v. Lower Florida Keys Hospital District, 403 So.2d 1025 (Fla.Dist.Ct. App.1981), cert. denied, 412 So.2d 463 (Fla. 1982), the Florida District Court of Appeals recognized that a cause of action for wrongful interference with a business relationship is allowed only when the interference *152 is by one who is not a party to that relationship. That court concluded that the doctors and the medical staff of the hospital were "parties" to the relationship between the hospital and the aggrieved medical doctor on the staff who attempted to show that the medical staff had interfered with his staff privileges. Therefore, no third-party interference existed. I am persuaded that the relationship between Dr. Creel and Henry County Hospital is factually similar to the relationship between the medical staff and the hospital in Buckner, supra; and that the relationship between Ms. Davis and Henry County Hospital, which was a leased facility of Health Care, is factually similar to the relationship between the hospital and the aggrieved physician in Buckner. I find from the undisputed evidence that Dr. Creel was a party to the relationship between Henry County Hospital and Ms. Davis; Dr. Creel was an essential entity (chief of the medical staff) of that hospital and was fulfilling the function of that hospital, i.e., delivery of competent medical services to patients at that hospital. As such a "party" to the relationship, Dr. Creel cannot, as a matter of law, be liable for tortious interference with the contract, Lolley v. Howell, 504 So.2d 253 (Ala.1987), without a showing that he acted outside the scope of his authority as chief of staff and did so maliciously, Hickman v. Winston County Hospital Board, 508 So. 2d 237 (Ala.1987).
Certainly, the chief of staff of a hospital, unless he acts with actual malice, should have the freedom to discuss with the administrator of that hospital the medical service personnel who are employed by that hospital or are considered for employment by that hospital, or are to perform medical services at that hospital even though technically not employed by that hospital, without having to defend an intentional interference with business or contractual relations action if the person performing the medical service is discharged by that hospital or is not permitted to perform medical services at that hospital. If a chief of staff, or for that matter, any member of the medical staff, of a hospital talks with the administrator of that hospital about the employment of a person who he thinks is not competent to perform medical services, he could face an intentional interference with business or contractual relations action. On the other hand, if he fails to challenge a person who he thinks is not competent to perform medical services, and his belief is substantiated by bad medical service to a patient, the chief of staff or medical staff member could face a medical malpractice action by the injured patient. To me, it seems that the majority opinion puts the chief of staff, and perhaps the entire medical staff of a hospital, on the horns of that dilemma. I do not believe that there is any precedent or authority for encouraging perfidy of the medical staff of a hospital that could lead to a deterioration of medical services to the patients of that hospital and its medical staff. Does this promote the proudest objective of tort law: making life safer? I think not. If our newly articulated tort imposes liability upon a chief of staff or member of the medical staff of a hospital, for discussing medical service personnel at that hospital or persons considered for employment by, or to work at, that hospital, with the administrator of that hospital, without proof that the chief of staff or member of the medical staff acted with actual malice, then this new tort needs to be revisited. The following are the concluding sentences of Peter W. Huber's book, "Liability": The Legal Revolution and its Consequences, at 232 (1988) (paraphrasing Grant Gilmore, The Ages of American Law, at 110-11 (1977)):
"Law reflects but in no sense determines the moral worth of a society. The better the society, the less law there will be. In heaven there will be no law, and the lion will lie down with the lamb. The worse the society, the more law there will be. In hell there will be nothing but law, and due process will be meticulously observed."
I would have Ms. Davis bear the burden of proving actual malice in order to recover from Dr. Creel under the facts in this case. "Actual malice" is defined in its common acceptance as "ill-will against a person," Boulden v. State, 102 Ala. 78, 83, 15 So. *153 341, 342 (1893); in its legal sense, "actual malice" is defined as "any unlawful act, wilfully done without just cause or legal excuse" and "that mental state or condition which prompts the doing of an unlawful act without legal justification or extenuation," Patterson v. State, 156 Ala. 62, 67, 47 So. 52, 54 (1908), either with an intent to do injury to another, United States Fidelity & Guaranty Co. v. Miller, 235 Ala. 340, 179 So. 239 (1938), or under such circumstances that the law will imply an evil intent. S.S. Kresge Co. v. Ruby, 348 So.2d 484 (Ala. 1977); Gulsby v. Louisville & N.R.R., 167 Ala. 122, 52 So. 392 (1910); Lunsford v. Dietrich, 93 Ala. 565, 9 So. 308 (1890).
This Court in Kenney v. Gurley, 208 Ala. 623, 626, 95 So. 34, 37 (1923), stated that actual malice "may be shown by evidence of previous ill-will, hostility, threats, rivalry, other actions, former libels or slanders, and the like, emanating from the defendant." See, Kirby v. Williamson Oil Co., 510 So.2d 176, 179 (Ala.1987); Wilson v. Birmingham Post Co., 482 So.2d 1209 (Ala.1986); Willis v. Demopolis Nursing Home, Inc., 336 So.2d 1117, 1120 (Ala. 1976). Consistent with this, Justice Adams, in his special concurrence in Hickman, supra, wrote:
"[I]n order to show malice the plaintiff must make a strong showing of a pattern of interference."
508 So.2d 237 at 241.
I have sifted and resifted the evidence in the record, and I do not find that slightest trace, that scintilla, of actual malice. Therefore, Dr. Creel's motion for a directed verdict and his motion for a judgment notwithstanding the verdict should have been granted. I would reverse and remand.
ADAMS and STEAGALL, JJ., concur.
NOTES
[1] Shokey's offer of a transfer does not defeat Davis's right of action. If RHS would not have forced Davis to choose between transfer or termination in the absence of Creel's wrongful interference, the situation is conceptually no different from one in which an employer would not have discharged an employee at will in the absence of wrongful interference from a third party. See Gross, supra.
[2] We do not concede Creel's point that there was no proof of malice, but we see no need for purposes of this opinion to discuss Davis's argument to the contrary or the evidence in support thereof.
[3] We reiterate that justification for interference with another's contract is an affirmative defense to be pleaded and proved by the defendant. Gross, supra. In an article entitled "Interference with Business Relations: the Unified Tort since Gross v. Lowder Realty," Andrew P. Campbell states that "[i]n subsequent decisions after Gross, the Alabama Courts have tended to place the burden on the plaintiff to prove absence of justification," citing this Court's case of Finley and the Court of Civil Appeals' case of Birmingham Television Corp. v. Deramus, 502 So.2d 761 (Ala.Civ.App.1986). Those decisions should not be read as shifting the burden of proof to the plaintiff, but should be read as holding that the defendant proved, as a matter of law, justification.